Next case is number 05-1273, NPF Ltd. v. Smart Parts, Inc. I'd like to start out by saying just a few words about the standard of review here. The standard of review is de novo with respect to the judgment as a matter of law, which means that this court does not have to give any deference to it. But we understand our standards. Please use your time on the substance of the argument. We believe the evidence is very substantial from which a reasonable judgment can be made. I've read a lot of the evidence that you cite, and I'm having trouble. I see that you had testimony that a reprogrammable chip would have done the job here. I understand the testimony to establish that the cost of the reprogrammable chips had come down up to 1997. But what seems to me to be missing is any testimony that there would have been a motivation or suggestion to substitute the reprogrammable chip for the non-reprogrammable chip. Can you tell me where I can find that testimony in the record? Now, just focusing on your testimony, forget about whether the other side's testimony created a jury question. Where in your testimony did someone, an expert, or someone, even someone else, testify that there was a motivation to substitute the reprogrammable chip? I don't believe our expert testified there was a motivation to substitute the reprogrammable chip, but our expert did testify that after reviewing the prior art, he felt that this was a substantial movement in advance in the prior art, placing a reprogrammable chip in an electronic paintball gun. But nobody talked about the cost. I can't tell from reading this record what the comparative cost of a non-reprogrammable chip and a reprogrammable chip is. Is it one cent? Is it ten cents? Is it a dollar? Ten dollars? You can't tell from the record, can you? I think there's some general testimony, but the cost, according to both the inventor who testified live and our expert who testified, was not the most significant factor. But he said it was a factor, but you didn't put in any evidence as to what the difference in the cost was. Well, I'm not sure that was our burden, Your Honor. Well, you were challenging the patent. I'm sorry. I represent NPF, the patent holder, and the patent was presumed to be valid. We put out expert testimony that showed that this was an advance over the prior art, that there was nothing in the prior art which would have motivated one of skill in the art to combine a reprogrammable chip with an external communication means in order to hook this up to a PC or other remote device. So it's those series of elements which, according to the inventor, were, and this was his term, revolutionary. And the reason it was, and he actually demonstrated to the jury why this was revolutionary. It revolutionized the repair of the guns, the maintenance of the guns, use of these guns in competition, because you could simply, instead of sending the gun back to the shop for maintenance and repair, you could actually do it on the fly. Here's the problem I have with your argument, and that is that the patent has been construed to cover not just consumer use but development, right? Well, I think it was construed to cover consumer and development. Development. So it covers development. Sure. No question about it. Where is the evidence in the record that you put on regarding that this was new and different in terms of the development stage, using these reprogrammable chips? The only evidence I could find is testimony by the inventor that said this was, he'd be surprised if other developers used this. But beyond that, I don't know what other evidence there was. Well, he testified, not that he would have been surprised. That wasn't the limit of his testimony. There was testimony, as I said, about how this revolutionized the industry and how this remote connection was very important to paintball guns and how the industry was teaching away from it and trying to ban this type of device because of their concern about danger and things like that. Go ahead. Don't all those issues go to consumer use and not use in the development stage? No, they don't. I think it's a mixed question, Your Honor. Well, tell me which of those things that you cited go to the development. The repair, the maintenance, that all is part of the development. While you're developing the gun, it can be repaired and maintained in different ways. So I wouldn't think all of those go to the consumer part of it. There is some developmental, but the patent is presumed valid, and all inferences must be drawn in favor of the verdict winner. So the amount of evidence that we have to produce in order to carry the day with the jury and win with respect to a judgment as a matter of law is, I think the term used by the court is substantial in other panels, is that that's more than a mere scintilla. But you agree that there was extensive testimony that reprogrammable chips had become very common and the cost had gone down substantially, right? I do agree. There's no question about that. In general applications, Your Honor. And there's also no question that a reprogrammable chip, in fact ones that were already on the market could have been substituted here for the non-reprogrammable chip used at the time the patent application was filed. I wouldn't go that far simply because, as I said before, the industry was saying, no, this is not going to work. No, no, no. I'm not talking about whether it would work or not. I'm talking about just as a technical matter that the testimony of Brodery and established that it would perform the necessary functions in the gun. Well, Mr. Rodrian never testified, to the best of my recollection, that he said it was possible from an engineering standpoint. Yeah, but he went through the functions and he testified that it could perform, that the reprogrammable chip could perform all the functions, right? No, I don't believe he did. In fact, he never testified about that there's anything in the art that would allow you to hook the gun up to a remote terminal and reprogram it. No, no, no. I'm not talking about that. I'm talking about the functions of the gun without the reprogrammable chip in it, that the reprogrammable chip could perform the same functions as the other chip, as the prior art chip, if you will. I don't recall that testimony. But, again, I believe when you take the testimony of the inventor and using the grain factors for non-obviousness, and you combine it with the testimony of our expert, which incidentally the district court never even mentioned. There's no mention of the— But as Judge Prost pointed out, isn't all that testimony about the commercial success and the grain factors directed to giving the consumer reprogrammability? In other words, where do we find in that testimony that other features of this, for example, its utility in connection with repairs, was something that led to commercial success? Well, I think Mr. Rice's testimony, the inventor, was enlightening in that regard about repair and maintenance and how this did— Yeah, but he didn't tie commercial success into repair and maintenance, did he? Yes, he did. Where? Well, I think his testimony wasn't terribly lengthy, but he did list all of these factors. Yeah, but we can't deal with it unless you can show us where. The question is, what did he say? And it would be helpful if you could point us to where he tied repair and maintenance into the commercial success. Well, he—right at the beginning of his testimony, when he was demonstrating the gun and hooked it up to a PC, he discussed in front of the jury— Yeah, but I'm talking about a page in the appendix. I don't have that at the tip of my tongue, Your Honor. But again, I believe there's enough evidence there when taken as a whole that it certainly supports the jury in concluding that the patent was non-obvious, not only Mr. Rice's testimony, but the expert's testimony, both on commercial success, developmental work. The evidence on the other side is, we believe, extremely weak. Mr. Rodrian, as I say, never— that these reprogrammable devices were used with regard to paintballs in the development stage. Is there a dispute about that? Well, yes, there is a dispute, because the president of SmartParts testified, yes, I used them, but there was also testimony by his supplier that said, no, they didn't. So that testimony's in conflict. Are you following me, Your Honor? Yeah. The president of SmartParts testified, yes, I used them in the developmental work. Weren't there other people from the industry besides the president? There was one other third-party witness, a Mr. Gaston, who testified that he thought he probably used them also, but this is oral testimony, non-corroborated in one case, contradicted, and we believe under Juicy Whip and the old barbed wire case, somebody getting up and saying, oh, yes, I did it in developmental work, is not enough. Who contradicted them on that? Mr. Scott. And he said it wasn't used? The supplier of the electronics for the gun said, no, reprogrammable microprocessors were not used in developmental guns. Where's that testimony? I don't have the exact— You know, you come here, it's helpful to know the appendix— I can certainly get it for you. I'll have it for rebuttal. Okay. Let's hear from the other side, and we'll save you rebuttal time. Mr. Rogers. Good afternoon, Your Honors. May it please the Court. My name is Craig Rogers. I'm counsel for Defendant Appelese, SmartParts, Inc. You've touched on a number of subjects that I'd like to address, but first of all, I think as a practical matter, it's easy to see what happened in this case. NPF successfully argued for a broad construction of the claims in order to gain summary judgment of infringement. Then at trial, NPF asserted a much more narrow interpretation of what the invention was in order to avoid a finding of obviousness. Yeah, but you still have a burden to establish that it was obvious, and you did establish that these reprogrammable chips were very common. They were used in a lot of consumer devices, but I didn't see anything about the relative cost of reprogrammable chips and other kinds of chips. Is there anything in the record about that? Yes. If you'll look at JA2065, this is the . . . JA2065? Yeah. This is the treatise that was relied upon by the district court showing that those in the industry understood that it was common to use reprogrammable microprocessors during development, but to replace those reprogrammable microprocessors with one-time programmable chips during production because of the cost. And the paragraph relied on by the district court is found at JA2064. It says most engineering products use EEPROM, or sometimes double EEPROM for their development phases. And then it talks about replacing those with one-time programmable chips during production. On the next page, it talks about upfront costs. It says, beginning with the first full paragraph, it talks about high upfront costs that prevent designers from using mass ROM parts. And then in the third full paragraph, it says, second sentence, as of this writing, the cost of EEPROM versions is about ten times the cost of ROM version, and the OTP is about 60% of the EEPROM version. And then it says, depending, of course, on volume. Yeah, but what does that mean? How do we know what that means? Well, it means that the reprogrammable microprocessors were ten times as costly as the non-reprogrammable microprocessors, so that their use in development could be financially reasonable. Well, how does that help you? I mean, if they're ten times more expensive, why is there a motivation to use them? Well, I guess that's the point. The point is, originally, there was motivation. Okay, the claims cover two aspects. They cover developer use of the reprogrammable microprocessors during the development phase in order to reduce the cycle time of bringing a product to market. So this writing says that it was obvious to use them there at least. Now, whether or not there was a motivation to also use them in the consumer goods depended highly upon the cost. The claims we're dealing with here are consumer good claims, right? Actually, the claims, as argued by them, in order to obtain summary judgment of infringement, were broad enough to cover both developer reprogrammability and consumer reprogrammability. That was the source of the confusion for the jury. The jury received all this evidence of consumer reprogrammability. Where do we find a claim construction that extends these claims to developmental use? The summary judgment decision by the district court and also the jury instructions to the jury explain that the claims were broad enough to cover both developer reprogrammability. Can you point us to a page in the jury instructions where it says that? I sure can. The jury instructions are found at JA 5936. 5936? Yes, 5936. It talks about the breadth of the claims. It talks about Claim 10, Claim 21, and Claim 21 and 39. It says the patent, as used in Claim 21 and 39 of the 814 patent, the phrase in communication Where are you reading at the bottom? The last paragraph on JA 5936. The phrase in communication with a remote terminal is broader than the data communication link limitation and includes both reprogramming and bidirectional data exchange. Where does it say that it covers developmental use? Well, actually, I think by not saying that it was limited to consumer reprogrammability, it says that it was broad enough to cover both development use and consumer use. Is there any place where the district court said specifically that 21 and 39 covered developmental use? Certainly in its JML opinion. Where does it say that? Let me find that right here. Okay, JA 47. This whole section here is talking about the legal effect of NPS evidence that the consumer reprogrammability feature was significant. So, where on that page? JA 47, last paragraph. It says the remaining question is the legal effect of the fact that it was obvious to use the reprogrammable processor in development guns but perhaps not obvious to sell guns with reprogrammable chips to the public. The legal effect is to render the claims obvious. And then it talks about as long as some motivation or suggestion combined is found in the references as a whole, it doesn't matter whether the specific use to which the plaintiff put the invention is different than what's covered by the claims as a whole. And then it talks in the next couple paragraphs as the result of finding that it was obvious to use them in the development process. In addition, this court— So your theory is that if we find that it was obvious to use it just in the developmental process, that's sufficient because of the breadth of the claims? That's exactly right. As a matter of fact, this court— Was that necessary? Was that broad finding necessary for infringement? In other words, are you all not in the consumer business but just using this in the developmental? That's exactly right. That's why the construction was that. Actually, at trial there was evidence that smart parts, not only did it not provide consumer reprogrammability, but also it specifically prevented consumers from accessing the reprogrammability by using boot codes and other things to make sure that consumers couldn't access that. In fact, the ASTM testimony that NPF relies on as suggesting a teaching away merely references the fact that smart parts was trying to avoid giving consumers access to reprogrammability because of the dangers it represented to tournament operators in being able to control the programs that would be used to operate the paintball guns, such as rate of fire, velocity, and other factors. So all of their testimony relates to preventing consumer reprogrammability, which smart parts didn't provide in its accused devices, which is another reason that I went back to the confusion manifested by the jury in their note that said that they believed that a portion of the patent was valid, but they didn't believe that smart parts was infringing on the patent. So what about the individual who supposedly testified that it wasn't obvious to use them in developmental work? Mr. Wharton referenced John Rice's testimony, and Rice's testimony to that extent is very short, as was recognized. He talked about him using reprogrammable microprocessors in development. In fact, what he suggested was that the reason this hadn't been done before… What's the testimony here on this point? Yeah, the testimony on that point was simply that he would have been surprised if others had been using reprogrammable microprocessors during development. That was it. Where is that? Somewhere in his testimony. Let me see. His testimony starts at JA 665. It would have been in the cross-examination, which began at page… Well, Mr. Warwison is looking for that. I have Mr. Rice's and Mr. Scott's testimony. Actually, that's another good point that I wanted to address. Mr. Warwison said that Mr. Scott testified that reprogrammable microprocessors were not used in smart parts paintball guns. That is incorrect. If you look at JA 459, first full paragraph, he's talking about the electronics used in smart parts paintball guns. Let's see, it would be the third sentence. It says, these electronics included a reprogrammable microprocessor with downloaded program code. Now, Mr. Scott did say that that processor wasn't programmed well in the gun, which suggests that it was an EPROM, which had to be removed from the gun and placed in a re-burn unit in order to erose the program and to reprogram it. But it still shows that it was obvious to use reprogrammable microprocessors in paintball guns. As those reprogrammable microprocessors developed, which is an art aside from the contributions of NPF, then it became more and more common to use reprogrammable microprocessors. You know what troubles me from this argument? We have the jury verdict, and you've pointed us to evidence on the other side, and we know that there's some evidence on the side of the jury, but I haven't heard, if to defending the JMOL, I haven't really heard why it is that no reasonable jury could have reached the verdict that they did. They split the verdict, so the jury was drawing a line somewhere, so one can sense that perhaps it was a close question. But with our obligation to draw inferences in favor of the jury, you really need to tell us that no reasonable jury could have come out the way this jury did, and therefore the JMOL was proper. That is correct, Judge Newman. What is correct, that you provided no support for that argument? The contrary, that no reasonable jury could have found that the claims were not obvious. But we know that there was evidence on the side of the jury verdict, and we've been hearing about these secondary considerations that, looking at it, I too might think, well, of course, you just submit the remote control, substitute the remote control, any fool can do that. But apparently it wasn't done. There were reasons not to do it, various reasons. There were considerations weighing against it. Why couldn't the jury have given adequate weight to those considerations to reach the result they did? The reason is because the evidence that NPF presented wasn't restricted to the claim scope as those claims had been identified by the district court during summary judgment. NPF's evidence of non-obviousness, the evidence that was apparently relied on by the jury... It was broader. It included developmental as well. But that doesn't say... Well, it was actually specifically related to two unclaimed features, consumer reprogrammability and real-time data access. As a matter of fact, if you look at the claims on JA88, you can see that the independent claims that were asserted, claims 21 and 39, and then claim 10 of the other patent, didn't limit themselves to consumer reprogrammability or real-time data access. Whereas dependent claims and other independent claims, like if you contrast claim 31, for instance, the final clause in that says electronically transmitting the pneumatic system operation data to the remote terminal in real time. So other claims in their patents certainly were limited to consumer reprogrammability or real-time data access, but not the claims that were asserted against smart parts because smart parts didn't use those features. Would you agree that if these claims were construed to be limited to consumer products that the jury verdict would be sustainable? It would certainly be much more readily sustainable. In fact, the JML decision by the district court recognized that if it was called upon to decide the other question, the question of whether or not consumer reprogrammability was obvious, that would be a different issue. But it wasn't. It was asked, given the broader construction of the claims that NPF presented in order to obtain a decision of infringement, it was presented with the question of whether dealer or manufacturer reprogrammability would have been obvious. Developmental. Developmental. Were the infallibility claims affirmative defenses or counterclaims? Both. Affirmative defenses and counterclaims. I guess it's a belt and suspenders approach. So NPF's argument in essence is that if some sort of – so they argue the claims are broad enough to cover developmental reprogrammability and consumer reprogrammability. And your basic point is that on the developmental reprogrammability there's only evidence you claim going one way. Exactly. That is correct. And so if NPF's position were accepted, that would mean that if a dependent claim somewhere along the line was found valid or patentable, then the independent claims would inherit the patentability or validity from that dependent claim. But this court has repeatedly held that features or benefits of the alleged invention that aren't specific limitations of the asserted claims can't aid in supporting their burden of showing non-obviousness. So it's our position that the district court apply the appropriate deference to the jury. Was this issue of claim scope and whether these two claims covered developmental paint guns argued to the district court? The claim construction was resolved on summary judgment. No, but I'm asking what was argued. Did the patent holder argue that the claims were broad enough to cover developmental work? It certainly did when it was asserting summary judgment of infringement. Do we have that in the joint appendix? Yeah, the summary judgment's in the joint appendix, and I believe some of the briefing is also in the joint appendix that talks about the claim construction that they were pursuing in order to obtain a decision on infringement. Okay. I think we've exhausted your time, Mr. Rogers. Thank you very much. Your Honor, the issue of developmental reprogrammable microprocessors doesn't just go one way. Mr. Rice's testimony, as I said before, does cover both when you read it, This is at JA679-685, where he explains the work he went through in connection with the paintball gun. Where does he discuss the developmental work? I don't have the actual testimony, Your Honor. This is my reply brief. You didn't bring the joint appendix with you? No, I didn't. It's not a good idea to do it. That's why you have a joint appendix. Do you want to borrow one? The point is that he testified about commercial and developmental work. That's what his testimony relates to. But there's a larger point. This patent is not just about reprogrammable microprocessors used in paintball guns. As I said during my first presentation, it also relates to the use of an external communication feature connected to a remote terminal. Does it cover developmental paintball guns? That remote terminal? These two clients, 21 and 39? 21 and 39? Do they cover guns used in developmental work? Yes. No question about it. I have to concede that there's no limitation in there about commercial. So if we were to conclude that the evidence showed that it was common knowledge to use these for developmental work, wouldn't that render these claims obvious? No, because there is no evidence to suggest, other than the inventor himself, there's no evidence to suggest anybody was using these in electronic paintball guns for developmental work. As I said, Mr. Scott, and I reference you to JA 460, Mr. Rogers reference 459, the next page, Mr. Scott contradicted Mr. Gardner and said no, reprogrammable microprocessors were not used in developmental work for these guns. Again, though, there's no corroboration by the two gentlemen who got up and said, yes, I think they probably were. There's no sketch, there's no drawing, there's no document, there's no third party witness to corroborate that. Who were the people who gave that testimony? Mr. Gardner said that orally without any documents to corroborate that. And what was his position? He was the president of the opposing party, Smart Party. And the other one? Mr. Gaston, who was a third party, testified. It was general testimony about, yes, I think I probably had reprogrammable microprocessors, but he acknowledged there was no external communication in the gun he was working with. So, again, it was missing a part, but there was no corroboration. So wait, so that testimony says no external communication, meaning you can't, it's not accessible from the outside. That's right. You can't connect it to a remote device like a PC. So it would not be used by consumers. Well, it couldn't be used by consumers for that purpose or by developmental people developing the gun because it didn't have an external communication. But, again, I think the key point is it's non-corroborated testimony. I think this Court has said often you can't have people take the stand and just say, oh, yes, I did that without any documents. But you're going to have corroboration of one witness's testimony by another disinterested witness. Yes, you can, but Mr. Gaston was not corroborating Mr. Gardner's testimony. They were talking about two totally different guns. Mr. Gaston was a third-party witness who said, yes, I think I used it in development too. So are you now agreeing that the use of, there was evidence, uncontradicted evidence of the use of these things in developmental guns, but your point is that there's no evidence that would satisfy the Claim 39 limitation about communication? Claim 21 has the communication language. Claim 39 is the dwell time. In other words, you're saying there is uncontradicted evidence of its use in developmental work, but what's missing is the communication aspect of it? No, I don't think there's any evidence of its use in developmental work that has been corroborated. I just thought you said there was. There are two people who orally testify, but it hasn't been corroborated. But the second witness can corroborate the first one? No, because the second witness testified about one gun totally distinct from the first witness, and he said, I think I used it in developmental work. The first witness was talking about a totally different gun. He said, I think I used it. He was contradicted by Mr. Scott, the passage I just read to you. Didn't even the inventor testify that he used reprogrammable processors in a prior gun? Not in the current invention, but in a prior gun. Yes, he did. As he was developing the gun. Not the gun of the invention, a prior gun. He testified and acknowledged that he had used it. I believe he did, yes. And don't you think that confirms the obviousness issue? No, I don't think so. Obviously, when an inventor is going down a path to conception and reduction of practice, he's going to use- I thought my question was, and maybe I wasn't clear enough. I'm not talking about when he was developing the gun, the subject of the invention, but before that. Developing a prior gun, which was not the subject of the invention. I thought his testimony was that even in that context, he had used reprogrammable. I think he did testify to that, Your Honor. But again, he didn't. That testimony did not specifically address all the elements of the claims. It didn't address the external communication feature and hooking it up to a remote device. Okay, yes, we are out of time. Thank you, judges. Thank you. I think we have the issues, Mr. Richardson, Mr. Rogers.